# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                           Case Number: 16-40020-DDC

CHRISTIAN M. WOODRUFF,

               Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant Christian M. Woodruff's Motion for Release. (ECF No. 45.) When Mr. Woodruff appeared before the court on February 10, 2020 for an initial revocation hearing, he waived his right to a preliminary hearing and a detention hearing. On that basis, the court ordered him detained pending his final revocation hearing, which was at that time scheduled for February 24. Since then, the final revocation hearing has been continued twice—once on his own motion to allow him an opportunity to explore mitigating evidence, and a second time *sua sponte* because of COVID-19 restrictions. Meanwhile, Mr. Woodruff reports that his incarceration has allowed him to get clean and sober. He now seeks release to reside with his parents at their home pending commencement of inpatient substance abuse treatment.

For the reasons set forth below, Mr. Woodruff's motion is granted in part and denied in part. It is granted to the extent that the court will allow him to be released to inpatient treatment. The motion is otherwise denied to the extent that he seeks release prior to inpatient treatment and it is denied as moot to the extent that he seeks an evidentiary hearing. The court will stay the release order until the date Mr. Woodruff is to report for inpatient treatment, which is currently

scheduled for April 28.  The release order is of course subject to any decisions District Judge Crabtree may make in connection with the final revocation hearing, such as whether to proceed with or continue the final revocation hearing that is currently scheduled for April 27 and whether to revoke Mr. Woodruff's supervised release and order a further term of incarceration.

## I.    BACKGROUND

In 2016, Mr. Woodruff pleaded guilty to possession of a firearm by a prohibited person and was sentenced to 30 months' imprisonment, followed by a three-year term of supervised release.  He began his supervised release on May 16, 2018.  He had no reported violations during the first ten months of his supervised release.  But then he began using methamphetamine in approximately March of 2019.

U.S. Probation Office records reflect that, on March 20, 2019, he submitted his first urine sample while on supervised release that tested positive for methamphetamine, and he signed a related admission of usage form.   He was referred for outpatient individual drug/alcohol treatment at Valeo Behavioral Health.   On April 9, he submitted another urine sample that tested positive for methamphetamine, and he signed a related admission of usage form.  By that point, he was attending treatment at Valeo.   He increased his reporting to his Probation Officer to weekly.   On May 28, he again submitted a urine sample that tested positive for methamphetamine, and he signed a related admission of usage form.   On May 17, he failed to attend his outpatient treatment at Valeo.   On June 1, he was with another convicted felon.   And, on June 4, he submitted another urine sample that tested positive for methamphetamine.   On June 10, with Mr. Woodruff's consent, the court modified his conditions of release to place him on curfew and location monitoring for 60 days.   (ECF No. 27.)

On July 8, he again submitted a urine sample that tested positive for methamphetamine and signed a related admission of usage form. On July 10, with Mr. Woodruff's consent, the court again modified his conditions of release—this time, to require him to reside in a Residential Re-Entry Center (RRC) for up to 120 days. (ECF No. 28.)

On July 26, Mr. Woodruff was placed at Mirror RRC. During his approximately four months at the RRC, the record reflects only one violation—a urine sample submitted on August 29 that tested positive for K2. He was released from the RRC on November 22.

On January 24, 2020, his supervising probation officer ("PO") attempted a home contact. Mr. Woodruff saw the PO, but refused to answer the door. The PO left a business card directing Mr. Woodruff to report to the U.S. Probation Office on January 27. Mr. Woodruff failed to do so. On January 29, Mr. Woodruff submitted a urine sample that tested positive for methamphetamine. He admitted that he had been using methamphetamine for the past month and a half, and also that he drank an excessive amount of water to try to clean out his urine.

On January 30, the U.S. Probation Office filed a Petition for Warrant or Summons for Offender Under Supervision, and District Judge Crabtree authorized a warrant for his arrest. (ECF No. 29.) Mr. Woodruff was arrested on this warrant on February 9. (ECF No. 39.) On February 10, he appeared for an initial revocation hearing. (ECF No. 32.) At that time, he waived his right to a preliminary hearing and a detention hearing, and on that basis the court remanded him to the custody of the U.S. Marshal Service pending his final revocation hearing. (ECF No. 32, 34, 35.) At that time, his final revocation hearing was set for February 24. On February 18, Mr. Woodruff moved to continue the final revocation hearing "so that the defense may continue to pursue and investigate potential mitigation on Mr. Woodruff's behalf." (ECF

No. 40.)   The court granted the motion and continued the final revocation hearing to March 30. (ECF No. 42.)

In March, the COVID-19 pandemic hit.   Chief Judge Robinson issued Administrative Order 2020-3, pursuant to which the court continued Mr. Woodruff's final revocation hearing to April 27.   (ECF No. 44.)   Given various COVID-19 restrictions, that hearing may be continued even further.

Mr. Woodruff has now been in custody since his arrest on February 9.   He contends that his incarceration has allowed him to get clean and sober.   He seeks release to home detention, with any further conditions the court finds necessary, pending his commencement of inpatient substance abuse treatment at Crawford County Mental Health Center in Girard, Kansas.   That inpatient admission date is currently scheduled for April 28, 2020.

## II.   REVIEW OF THE COURT'S PRIOR DETENTION ORDER

Mr. Woodruff moves the court to reopen the detention hearing on two grounds: (1) based on a material change in circumstances pursuant to 18 U.S.C. § 3142(f), and (2) because he contends that release is "necessary for preparation of the person's defense or for another compelling reason" pursuant to 18 U.S.C. § 3142(i).   Mr. Woodruff, however, has not cited any authority that § 3142 applies to the issue of detention pending a final revocation hearing.   The Federal Rules of Criminal Procedure state that it does not.   They state that "[t]he provisions of 18 U.S.C. §§ 3142 and 3144 govern *pretrial release*."   FED. R. CRIM. P. 46(a) (emphasis added).   In contrast, Federal Rule of Criminal Procedure 32.1(a)(6) governs release pending a hearing on probation or supervised release violations.   FED. R. CRIM. P. 46(d).   According to that rule, the magistrate judge "may release or detain the person under 18 U.S.C. § 3143(a)(1) pending further proceedings."   FED. R.

CRIM. P. 32.1(a)(6).   Review of a detention order under § 3143 is governed by § 3145(b), which allows "a motion for revocation or amendment" of the detention order.   § 3145(b).

Review of the detention order pursuant to § 3145(b) is warranted to determine whether it should be revoked or amended based on the legal standards set forth in § 3143(a)(1).   Mr. Woodruff waived his right to a detention hearing based on the assumption that his detention hearing would be held—consistent with this court's usual practice—soon thereafter (other than whatever extensions he intended to request to prepare mitigating evidence).   However, that did not happen given the continuance of the final revocation hearing prompted by COVID-19 restrictions.   Since his initial revocation hearing, he has been in custody for over two months, which has allowed him to get clean and sober.   He has been evaluated by a licensed professional and recommended for inpatient treatment for substance abuse.

The government argues Mr. Woodruff's "waiver of a detention hearing was unequivocal and did not reserve the right to reopen said hearing if circumstances changed."   (ECF No. 48, at 3.)   The government cites no authority to support this waiver argument, and the court finds it unpersuasive.   Mr. Woodruff could not have reasonably foreseen at the time of his waiver unprecedented COVID-19 restrictions that would later cause the final revocation hearing to be continued.   The government also argues that Mr. Woodruff's "forced sobriety due to incarceration was reasonably foreseeable."   But this argument goes to the standard for reopening detention under § 3142(f)—e.g., whether "information exists that was now known to the movant at the time of the hearing."   And, as set forth above, § 3142(f) does not apply here.

III.   **PROPOSED RELEASE PLAN**

As explained above, the court applies the legal standard set forth in § 3143(a)(1) to determine whether Mr. Woodruff should be released or detained pending the final revocation

hearing. FED. R. CRIM. P. 32.1(a)(6). That statute requires the court to order him detained if the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." § 3143(a)(1). "The burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person." FED. R. CRIM. P. 32.1(a)(6). Here, Mr. Woodruff seeks release to home detention, followed by inpatient treatment.

A. **Stage One: Release to Home Detention**

Mr. Woodruff proposes to live in the basement of his parents' home, where he has always lived. He contends that his parents support his home detention there pending his final revocation hearing, that they are "staunchly against illicit drug use," and that they agree to notify the court if they become aware of him violating his conditions of release.

This is the exact environment where Mr. Woodruff was living while he was using methamphetamine for months while on supervised release and the place he was at when he refused to open the door when his PO last attempted a home visit in January 2020. After that, he failed to report as directed to the U.S. Probation Office and was ultimately arrested. Returning to this environment will likely derail Mr. Woodruff's current sobriety and set him back when he enters inpatient treatment. Indeed, he admits that he suffers from a substance abuse disorder and that, to remain sober in the long run, "he is in need of additional help beyond the bi-monthly outpatient treatment services he has been receiving while on supervision." (ECF No. 45, at 6.) Returning to live at home will not provide this help. To the contrary, it is far more likely that the lack of structure in this environment and its prior correlation with his noncompliance will derail his current sobriety and set him back when he enters inpatient treatment. It will also effectively condone his refusal to respond to his PO by sending the message that the court is willing to turn a blind eye to

such behavior. And, his likely noncompliance will increase COVID-19 risks to the U.S. Probation Office in supervising him, and to the U.S. Marshal Service and federal detention facilities in re-apprehending him and returning him to custody if and when he violates his conditions of release, as he likely will.

In sum, Mr. Woodruff has not established by clear and convincing evidence that he will not flee or pose a danger to others if he were released to home detention to live in his parents' basement. To the contrary, he will likely reengage in noncompliance while living there. The court therefore denies his motion to the extent that he seeks release to home detention pending commencement of inpatient treatment.

### B. Stage Two: Inpatient Treatment

However, the court finds that Mr. Woodruff has established by clear and convincing evidence that he will not flee or pose a danger to others if he were released to inpatient treatment. He appears to have remained clean, sober, and largely compliant with his release conditions during his four-month stint at the RRC, with the exception of one violation during that time period. The inpatient treatment facility will presumably provide an even more structured environment. And Mr. Woodruff states that he is amenable to any other conditions of release the U.S. Probation Office believes are appropriate.

The government argues that "there is no guarantee the defendant will follow any proposed rehabilitation program and/or not continue to use controlled substances; and, given his numerous refusals to comply with court ordered terms of release, the court has no evidence that it can release the defendant into an inpatient facility and at the same time reasonably assure the safety of the community." (ECF No. 48, at 6-7.) Likewise, his supervising PO does not support inpatient treatment because Mr. Woodruff has been in outpatient treatment on and off since March of 2019

and, during this time, "he did not take his sobriety serious and did not take treatment serious." (ECF No. 48, at 4.) The court is certainly mindful of these concerns and is also concerned that Mr. Woodruff may not be able to overcome his addiction, which appears to be at the root of his problems. But, again, his relative lack of violations during his four-month stint at the RRC suggests that he may succeed at inpatient treatment. At a bare minimum, it suggests that he should be given at least a chance to succeed. Furthermore, Mr. Woodruff ought to be sufficiently motivated to succeed at inpatient treatment at this procedural juncture. He states that he understands that, "if released, everything is riding on his compliance with all conditions pending his final revocation hearing." (ECF No. 45, at 7.)

The Government argues the decision as to whether Mr. Woodruff will attend inpatient treatment should wait until the final revocation hearing, which is currently scheduled for April 27. (ECF No. 48, at 8.) The court disagrees. Whether the final revocation hearing will proceed on April 27 or be continued as a result of COVID-19 restrictions remains to be seen. Meanwhile, Mr. Woodruff reportedly has a spot secured at the inpatient treatment facility the following day, April 28. Ordering his release to attend inpatient treatment will facilitate making the appropriate arrangements in the event the April 27 hearing is ultimately continued. And, of course, if District Judge Crabtree decides to proceed with the final revocation hearing on April 27, he can decide whether to allow this order to stand (and thus allow Mr. Woodruff to report for inpatient treatment the following morning) or whether to revoke Mr. Woodruff's supervised release and order a further term of incarceration.

For similar reasons, the court is unpersuaded by the government's argument that, "if the court were to eventually grant defendant's request for inpatient treatment, the final revocation hearing would be continued until his release, successful or not, from said treatment facility." (*Id.*

at 9.)   Even if District Judge Crabtree continues the final revocation hearing, it is his prerogative to set the final revocation hearing for whatever date he deems appropriate, regardless of whether Mr. Woodruff is in inpatient treatment.

## IV.    EVIDENTIARY HEARING

Lastly, Mr. Woodruff's motion also originally sought an evidentiary hearing in order to provide the court with copies of the Heartland RADAC evaluation recommending his placement in inpatient treatment, along with a letter confirming his admission date to the Crawford County Mental Health Center.   (ECF No. 45, at 1.)   But Mr. Woodruff has since submitted that RADAC evaluation to the court via a separate filing, and the court will credit counsel's representation that his inpatient treatment is now scheduled for April 28.   Therefore, an evidentiary hearing is unnecessary.   That aspect of Mr. Woodruff's motion is therefore denied.

**IT IS THEREFORE ORDERED** that Mr. Woodruff's Motion for Release is granted in part and denied in part as set forth above.   Specifically, the motion is granted to the extent that the court orders Mr. Woodruff to be released to commence inpatient treatment, but the court will stay the release order until that date.   The motion is otherwise denied.

**IT IS FURTHER ORDERED** that the U.S. Probation Office shall prepare an order setting the conditions of release that it believes are warranted, circulate the proposed order to counsel for approval, and, once approved by counsel, submit it to the undersigned for approval.

**IT IS SO ORDERED**.

Dated this 14th day of April 2020.

s/Angel D. Mitchell
Angel D. Mitchell
United States Magistrate Judge